# IN THE SUPREME COURT OF TENNESSEE
## AT KNOXVILLE

## DAN ALEXANDER v. JAY ARMENTROUT, JR. and PATRICIA RUTH ARMENTROUT

**Appeal from the Circuit Court for Washington County**
**No. 7365    Lewis W. May, Judge**

---

### No. E1998-00136-SC-R11-CV - Decided - June 9, 2000

### NOT FOR PUBLICATION

---

This appeal arises from a dispute between brothers-in-law over the sale of a partnership interest in a family dairy business. After reaching an oral agreement regarding the price of the interest to be sold, the buyer tendered $50,000 of the purchase price to the seller and later presented a promissory note evidencing an obligation for the $61,000 balance of the sale. The seller's home subsequently burned and the note was destroyed. A dispute arose between the parties as to the validity of the note and the existence of an agreement. The seller contends that the note handed to him by the buyer does not contain the true terms of the contract. He argues that his agreement was with the buyers and not with the buyer's corporation. The buyer contends that his corporation is liable on the note and not him personally. A jury found that the note was not accepted by the seller and rendered judgment against the buyer and his wife, rather than against the corporation. In reviewing the trial court's denial of the buyer's motion for a directed verdict, the Court of Appeals reversed the jury's findings and held that the seller accepted the promissory note and was estopped from denying his acceptance. Accordingly, the intermediate court reversed the judgment against the buyer and his wife, finding them not to be personally liable on the promissory note. After a close review of the record, we have concluded that while the Court of Appeals correctly reversed the judgment against the buyer's wife, it erred by reversing the jury's verdict with respect to the buyer personally. We therefore reinstate the jury's verdict and judgment against the buyer.

**Tenn. R. App. P. 11 Appeal by Permission; Judgment of the Court of Appeals Reversed in Part and Affirmed in Part.**

DROWOTA, J., delivered the opinion of the court, in which ANDERSON, C.J., BIRCH, HOLDER & BARKER, JJ. joined.

Timothy S. Belisle and Randall E. Sermons, Johnson City, Tennessee, for the appellant, Dan Alexander.

Rick J. Bearfield, Johnson City, Tennessee, for the appellees, Jay Armentrout, Jr. and Patricia Ruth Armentrout.

**OPINION**

FACTUAL BACKGROUND

Between 1980 and 1993, Dan Alexander and Jay Armentrout, Jr. owned and operated a dairy farm, Alexander-Armentrout Dairies, as a partnership.[1] The two men are brothers-in-law; Alexander is married to Armentrout's sister. In June 1993, after disagreements about certain aspects of the partnership, the men decided to dissolve their business relationship. As a result, Armentrout agreed to purchase Alexander's interest in the partnership for $111,000. Under their agreement, Armentrout was to receive all of the partnership assets and was to assume all partnership liabilities. Aware that Armentrout would be unable to produce the entire $111,000 at once, Alexander agreed to receive a partial payment for his interest, but to finance the balance under a promissory note. The parties did not prepare a written contract for the sale of Alexander's partnership interest to Armentrout.

In July 1993, the parties met at Hamilton Bank to close the sale of Alexander's interest. Alexander received a cashier's check for $50,000, bearing the names of Jay and Patricia Armentrout, as an initial payment toward his interest. (The Armentrouts had obtained a loan to secure the $50,000.) The parties agreed that the $61,000 balance would be paid pursuant to a promissory note that Armentrout would obtain and present to Alexander in the near future. No note had been prepared or executed at the time of the closing.

Sometime thereafter, Armentrout asked the partnership's accountant, Kenneth McCurry, to prepare a promissory note evidencing the balance he owed Alexander for the sale. McCurry drafted a note stating that "[f]or value received, Jay Armentrout d/b/a Armentrout Acres, Inc., promises to pay to the order of Dan Alexander . . . , the principal sum of _____ plus interest accruing from July 6, 1993 at the rate of 7½% per year up to January 20, 1995." The note provided that as of January 1995, the interest rate would change consistent with the rate being charged by the bank on the loan Armentrout secured to finance the sale of the partnership. The promissory note contained two signature lines:

> Armentrout Acres, Inc.
> Signature _____
>     By Jay Armentrout
>
> Signature _____
>     Jay Armentrout

The copy of the note admitted at trial contained the figure $61,000 in the blank space for the amount

---

[1] There was no written partnership agreement. There was, however, a written buy-sell agreement that the men were required to sign in order to obtain life insurance policies covering each partner. Pursuant to the agreement, neither partner could transfer his interest in the partnership to a third party without giving the other partner the opportunity to acquire the interest himself. The buy-sell agreement is not at issue in this litigation.

of the note. The only signature on the document was Armentrout's on the line designated for Armentrout Acres, Inc., "By Jay Armentrout." His personal signature line was blank.

Some six to eight weeks after the closing, Armentrout presented the note to Alexander, who was outside working in his fields. Upon an initial reading of the note, Alexander observed that the terms were not what he understood them to be during the closing. Accordingly, he told Armentrout: "Let me take this and look this over and I'll get back with you." At trial Alexander testified that he did not tell Armentrout that the note was acceptable.[2] When asked at trial whether the note was signed by anyone when he received it, Alexander replied: "I can't sit here in this chair and swear that it was signed by anyone. At that time it was immaterial to me whether it was signed or not, because it wasn't the note - it wasn't the terms we agreed upon."

Alexander retained the note and looked it over on one or two more occasions during the next two or three weeks. He testified that he continued to review the document because he was

> [t]rying to figure out where the terms in that note originated, how they came about those terms, as they were contrastly different from what we had agreed upon at the bank. And I was - I, being the lender, was going to prepare to draw up a note of my own at that time and get Mr. Armentrout to sign it stating the terms. That was my intent.

In September 1993, Alexander's home burned and the note was destroyed in the fire. At trial, Alexander testified:

> Sometime after that fire, you're trying to recall everything that you lost, what was of importance. One of the things was that note. And within a month to six weeks I told Jay that I had lost that note and I needed another copy to review because those terms that were in that note, being so foreign to me, I couldn't remember exactly what they were after reviewing them just a time or two. And I wanted to review those terms again and get something drawn up that actually was what we were agreed upon.

When asked whether he recalled the terms of the note that Armentrout had presented to him, Alexander replied: "I do now after seeing a copy of it." He testified that he finally received a copy of the note in the summer of 1996 - almost three years after his copy was destroyed in the fire.

In June 1995, two years after the sale of the partnership, Alexander received a check drawn on Jay and Patricia Armentrout's personal account in the amount of $6,310, marked with the words "note payment." Alexander testified that although he was "glad to get any money at all," he was "[s]urprised to get the check, and befuddled by the amount." He testified that he was confused by

---

[2] Alexander testified that upon receiving the note he also asked Armentrout about a deed of trust for the real estate. He testified that Armentrout replied: "There's not going to be any. . . . I've got that covered with the sixty-one thousand ($61,000) dollar life insurance policy on myself. . . ."

the amount of the check because it "wasn't even the interest up to that time." Nonetheless, Alexander deposited the check into his account. Sometime thereafter Alexander asked Armentrout about the amount of the payment. Armentrout simply informed him to talk with his attorney.

Alexander consulted an attorney to have a note and a deed of trust drafted that accurately stated the terms of the agreement. Alexander's attorney drafted a note and deed of trust and sent them to Armentrout to be signed. Armentrout did not respond.

In January 1996, Alexander received a check drawn on the account of Armentrout Acres, Inc. in the amount of $6,310. He deposited this check into his personal account. After receiving the second payment, Alexander determined that the total of the two payments exceeded the interest due under the note until that time. Accordingly, he wrote Armentrout a check for $700, the amount by which Alexander believed Armentrout had overpaid the interest that had accrued until that point. He mailed the check along with a note stating: "[T]ake this check, and as of today, you still owe me $61,000 because you've overpaid interest by $700. You still owe me $61,000. Sign the note. Sign the deed of trust. And let's get on with it." Armentrout did not respond to the correspondence. Alexander than called Armentrout to find out whether he planned to sign the note. According to Alexander, Armentrout merely told him to talk to his attorney. Alexander received no further payments.

Alexander filed suit against Jay and Patricia Armentrout on September 5, 1996, in the Washington County Circuit Court. Following a trial in October 1997, a jury returned a special verdict form finding that Alexander did not accept the note he received from Armentrout and finding Jay and Patricia Armentrout liable to Alexander for the sale of the partnership interest.[3] Although the verdict form did not state the amount of the verdict, the trial court entered judgment in favor of Alexander in the amount of $70,432.15.[4]

The Court of Appeals reversed the jury's verdict. It determined that Alexander was equitably estopped from denying that he accepted the promissory note delivered by Armentrout. Furthermore, the intermediate court found that because Armentrout had signed the note only in his capacity as representative of Armentrout Acres, Inc., he was not personally liable on the note. Lastly, the Court of Appeals found that Patricia Armentrout was not liable on the promissory note because she was not a party to the sale of the partnership interest. For these reasons, the intermediate court held that

---

[3]The special verdict form provided as follows:

Was the note accepted?  _____ YES  ___X___ NO
If you answered YES:
    Who owes the money:  _____ Armentrout Acres, Inc. or _____ Jay Armentrout
If you answered NO:
    Judgment is against:  _____ Jay Armentrout or __X__ Jay Armentrout and wife, Patricia Armentrout

[4]The parties apparently stipulated to the amount of the note and interest; the issue was whether Jay and Patricia Armentrout were personally liable or whether the corporation was liable.

the trial court erred in denying the defendants' motions for a directed verdict.

We granted Alexander's petition to appeal in order to determine whether the Court of Appeals properly applied the standard of review in reviewing the trial court's denial of the defendants' respective motions for a directed verdict and whether the Court of Appeals properly based its decision on equitable estoppel when this issue was not addressed at trial. Because we conclude that the Court of Appeals improperly applied the standard of review, we reverse the intermediate court's decision and reinstate the jury's verdict with respect to Jay Armentrout. We also conclude that because the issue of estoppel was not preserved for appeal, the Court of Appeals erred by basing its decision on that ground. We do agree with the intermediate court, however, that the jury erred in finding Patricia Armentrout liable for the debt at issue.

## STANDARD OF REVIEW FOR MOTION FOR A DIRECTED VERDICT

The Court of Appeals properly stated the standard of review for reviewing a motion for a directed verdict:

> A directed verdict is appropriate only when the evidence is susceptible to but one conclusion. Eaton v. McLain, 891 S.W.2d 587, 590 (Tenn. 1994); Long v. Mattingly, 797 S.W.2d 889, 892 (Tenn. Ct. App. 1990). We must "take the strongest legitimate view of the evidence favoring the opponent of the motion when called upon to determine whether a trial court should have granted a directed verdict." Id. In addition, all reasonable inferences in favor of the opponent of the motion must be allowed and all evidence contrary to the opponent's position must be disregarded. Eaton, 891 S.W.2d at 590; Long, 797 S.W.2d at 892.

As this Court has stated: "The court may grant the motion only if, after assessing the evidence according to the foregoing standards, it determines that reasonable minds could not differ as to the conclusions to be drawn from the evidence." See Eaton v. McLain, 891 S.W.2d at 590.

Despite having identified the correct standard of review, we are of the opinion that the Court of Appeals misapplied the standard when evaluating the evidence. In our view, the intermediate court essentially engaged in a *de novo* review of the evidence in that it appears to have disregarded the jury's findings and to have reevaluated the evidence in its entirety. The jury specifically found, in a special verdict form, that Alexander did not accept the promissory note presented to him by Armentrout and that Armentrout was personally liable to Alexander on the debt. Ample evidence supports both the verdict and the trial court's denial of Jay Armentrout's motion for directed verdict. In order to conclude that the trial court erred in denying the defendants' motions for directed verdict, the Court of Appeals must have found that the evidence presented is susceptible to only one conclusion and that reasonable minds could not differ as to whether Alexander accepted the promissory note. Based upon the sufficient evidence supporting the jury's verdict, we disagree.

## JURY'S FINDINGS REGARDING ACCEPTANCE OF THE NOTE

With respect to acceptance of the promissory note, Alexander's testimony was more than sufficient to survive a motion for directed verdict. The jury heard Alexander testify that upon receiving the promissory note from Armentrout, while outside working in his fields, he took a preliminary glance at the note and realized that its terms looked "foreign" and did not represent the agreement the parties had reached at the closing. When asked whether he told Armentrout that the note was acceptable, Alexander testified that he did not. The jury also heard Alexander state that after reviewing the note on more than one occasion, he was baffled by its terms. The jury reviewed correspondence from Alexander asking Armentrout to sign a second promissory note and deed of trust drafted by Alexander's attorney so that they could "get on with it."

In addition to Alexander's testimony, the jury also heard the testimony of Kenneth McCurry, the partnership's accountant. He testified that he drafted the original promissory note at Armentrout's request, and that he understood the note to be a "working document or a negotiating tool."[5]

Applying the applicable standard of review, as stated above, we conclude that the trial court correctly denied Armentrout's motion for a directed verdict on the issue of acceptance of the promissory note.

As Alexander points out, Tenn. R. App. P. 13(d) also supports this result. Rule 13(d) provides that "[f]indings of fact by a jury in civil actions shall be set aside only if there is no material evidence to support the verdict." The jury found in a special verdict that Alexander did not accept the note. Because these findings are supported by material evidence, as demonstrated above, the Court of Appeals erred in setting aside the jury's finding on the issue of acceptance.

Additionally, we conclude that the Court of Appeals erroneously relied upon the doctrine of equitable estoppel in reversing the judgment of the trial court because the doctrine was not properly preserved for appeal. The intermediate court found that Alexander was equitably estopped from denying that he accepted the promissory note delivered to him by Armentrout. In their answers to both the complaint and the amended complaint, the Armentrouts did not raise the defense of equitable estoppel, despite the requirement in Tenn. R. Civ. P. 8.03 that a defendant "set forth affirmatively facts in short and plain terms relied upon to constitute . . . estoppel . . . ." The Armentrouts' attorney never mentioned equitable estoppel in his opening and closing arguments to the jury or during any other portion of the trial. No jury instruction was requested on equitable estoppel, and the jury heard no law with regard to the affirmative defense. Moreover, the Armentrouts did not raise the defense of equitable estoppel in their respective motions for a new trial. Because the defense of equitable estoppel was never raised during the trial court proceedings, the issue was waived and the Court of Appeals should not have

---

[5]The Court of Appeals opinion does not refer to this critical testimony.

considered the defense.  <u>See</u> Tenn. R. App. P. 3(e);[6] Tenn. R. App. P. 36(a).[7]

## JURY'S FINDINGS REGARDING LIABILITY

Since we conclude that Alexander did not accept the promissory note presented to him by Armentrout, we disagree with the Court of Appeals' statement that Armentrout's "claim against Mr. Alexander must rise or fall on that instrument."  Having determined that the promissory note is not dispositive,[8] we must examine what type of agreement, if any, was reached by the parties.[9]

The jury, after determining the note was not accepted, found that the Armentrouts were liable to Alexander.  This finding necessarily implies that the parties reached an agreement, despite the existence of a promissory note.  Ample material evidence supports this conclusion. The jury heard Alexander testify that prior to the July 1993 closing, he and Armentrout agreed that he would sell his partnership interest for $110,000.  He testified that at the closing, he accepted a $50,000 cashier's check from the Armentrouts and that the parties agreed that he would accept a promissory note to represent the $61,000 balance due.  According to Alexander's testimony, the parties also discussed the terms of the repayment, which was to occur over a nine year period, and the interest rate that would apply.  While no instrument was drafted at the closing, Alexander testified to these terms of the parties' agreement.

---

[6] Tennessee Rule of Appellate Procedure 3(e) provides, in pertinent part: "An appeal as of right . . . may be taken . . . [p]rovided, however, that in all cases tried by a jury, no issue presented for review shall be predicated upon error . . . or other ground upon which a new trial is sought, unless the same was specifically stated in a motion for a new trial; otherwise such issues will be treated as waived."

[7] Tennessee Rule of Appellate Procedure 36(a), which concerns an appellate court's power to grant relief, provides, in pertinent part: "Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonable available to prevent or nullify the harmful effect of an error."

[8] Because we conclude that the promissory note was not accepted, the instrument is not pertinent in this appeal. Accordingly, we will not address the issue of whether Armentrout Acres, Inc. or Jay Armentrout in his personal capacity is liable on the note.

[9] Armentrout argues that any oral agreement between him and Alexander is unenforceable under the Statute of Frauds because, in accordance with the parties' discussion, it could not be performed within one year and is not evidenced by a signed writing. (Tennessee Code Annotated §29-2-101 (1999 Supp.) provides that "no action shall be brought . . . upon any agreement or contract which is not to be performed within the space of one (1) year from the making of the agreement or contract" unless the agreement is in writing and "signed by the party to be charged . . . .") Although Armentrout's counsel listed the Statute of Frauds as a defense in his responsive pleadings, he did not argue the issue again until he filed a response to Alexander's Rule 11 application to appeal to this Court.  Counsel did not object to the trial court's failure to instruct the jury on the Statute of Frauds, nor did he include such objection in his motion for a new trial. Moreover, despite its potential significance in this suit, counsel made no argument regarding the Statute of Frauds to the Court of Appeals.  Because the issue was not properly preserved for appeal, it is waived and will not be considered by this Court.  <u>See</u> Tenn. R. App. P. 3(e); Tenn R. App. P. 36 (a).

The testimony of Kenneth McCurry, the partnership's accountant, bolsters that of Alexander regarding the agreement. He testified that during their business dealings, Jay Armentrout acknowledged that he owed Alexander money in connection with the sale his partnership interest. McCurry also testified that Armentrout's personal accounting records reflect that he owes Alexander $61,000.

Possibly more compelling, the jury heard Jay Armentrout admit under oath that Alexander "is owed money" in connection with the sale of the partnership interest. When asked by the trial court, Armentrout agreed that the question was not whether Alexander was owed money, but who owes the money: Armentrout individually or Armentrout Acres, Inc. This testimony, in conjunction with that of Alexander, supports the jury's finding that, despite the absence of a writing embodying specific terms, an agreement existed between the parties under which Armentrout was liable to Alexander for the balance on the sale of his partnership interest.

When a record contains material evidence supporting a verdict, the judgment based on that verdict will not be disturbed on appeal. See Reynolds v. Ozark Motor Lines, Inc., 887 S.W.2d 822, 823 (Tenn. 1994); Tenn. R. App. P. 13(d). Based upon on the foregoing, we conclude that ample evidence supports the jury's finding that the parties reached an agreement whereby Armentrout is liable for the balance stemming from the sale of the partnership interest. Moreover, the dispute between the parties concerning this agreement hinges on witness credibility, an issue within the province of the jury. See State v. Wilson, 924 S.W.2d 648, 649 (Tenn. 1996); Reynolds v. Ozark Motor Lines, Inc., 887 S.W.2d at 823. The jury implicitly found Alexander to be a credible witness, and we will not upset this finding.


## LIABILITY OF PATRICIA ARMENTROUT

On its verdict form the jury indicated that judgment was against "Jay Armentrout and wife, Patricia Armentrout." The Court of Appeals reversed that finding, stating that Mrs. Armentrout "was not a party to the note." However the intermediate court observed that even if the note were not at issue, Mrs. Armentrout would not be liable on the debt owed Alexander, as "she never expressly promised to pay any portion of the $110,000 obligation."

We agree with this analysis. While the jury found Patricia Armentrout liable for the debt, the evidence in the record does not support this verdict. The record demonstrates that Patricia Armentrout was not a party to the partnership nor was she a party to the sale of the partnership interest. As the Court of Appeals observed: "The mere presence of Mrs. Armentrout at closing and the appearance of her name on documents *associated* with the purchase of Alexander's interest are not enough to establish an implied contract holding her responsible for the obligation to Alexander." The proof shows that all negotiations regarding the sale of the partnership interest were between Dan Alexander and Jay Armentrout. We conclude that the Court of Appeals correctly reversed the jury's verdict with respect to Patricia Armentrout.

## CONCLUSION

With respect to the acceptance of the promissory note and the liability of Jay Armentrout, the judgment of the Court of Appeals is reversed and the jury verdict is reinstated. The Court of Appeals' finding with respect to the liability of Patricia Armentrout is affirmed and the jury's verdict on that issue is reversed. Costs of this appeal are taxed to the defendant / respondent, Jay Armentrout, Jr.